

**null / ALL**
**Transmittal Number: 31787920**
**Date Processed: 07/08/2025**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | SOP Team nwsop@nationwide.com<br>Nationwide Mutual Insurance Company<br>1 Nationwide Plz<br>Columbus, OH 43215-2226 |
| **Electronic copy provided to:** | Ashley Roberts |
| **Entity:** | Scottsdale Insurance Company<br>Entity ID Number 3286058 |
| **Entity Served:** | Scottsdale Insurance Company |
| **Title of Action:** | Rusco Operating, LLC, Rudtuk Operating, LLC, and Workrise Technologies Inc vs. Scottsdale Insurance Company |
| **Matter Name/ID:** | Rusco Operating, LLC, Rudtuk Operating, LLC, and Workrise Technologies Inc vs. Scottsdale Insurance Company (17573824) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Travis County District Court, TX |
| **Case/Reference No:** | D-1-GN-25-003866 |
| **Jurisdiction Served:** | Texas |
| **Date Served on CSC:** | 07/08/2025 |
| **Answer or Appearance Due:** | 10:00 am Monday next following the expiration of 20 days after service |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Haynes & Boone, LLP<br>N/A |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

**EXHIBIT**

**A**

CITATION

THE STATE OF TEXAS

**CAUSE NO. D-1-GN-25-003866**

RUSCO OPERATING, LLC; RUDTUK OPERATING, LLC; WORKRISE TECHNOLOGIES INC.

, PLAINTIFF(S)

vs.

SCOTTSDALE INSURANCE COMPANY

, DEFENDANT(S)

TO:   **SCOTTSDALE INSURANCE COMPANY**
**BY SERVING ITS REGISTERED AGENT COMMISSIONER OF INSURANCE**
**PO BOX 149104**
**AUSTIN TX 78701**

Defendant, in the above styled and numbered cause:
**YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org."**

Attached is a copy of the **PLAINTIFF'S ORIGINAL PETITION** in the above styled and numbered cause, which was filed on **MAY 29, 2025** in the **345TH DISTRICT COURT** of Travis County, Austin, Texas.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office, **JUNE 03, 2025**

REQUESTED BY:
**EMILY LOUISE BUCHANAN**
**2801 N HARWOOD STE STE 2300**
**DALLAS, TX 75201-2754**



Velva L Price
Travis County District Clerk
Civil Family Court Facility (CFCF)
1700 Guadalupe Street, P.O. Box 679003 (78767)
Austin TX 78701

**Ana Henriquez Quesada, Deputy**

**R E T U R N**

Came to hand on the _____ day of _____, _____ at _____ o'clock _____M., and executed at
_____ within the County of _____ on the _____ day
of _____, _____, at _____ o'clock _____M., by delivering to the within named
_____, each in person, a true copy of this citation together with
the **PLAINTIFF'S ORIGINAL PETITION** accompanying pleading, having first attached such copy of such citation to such copy of
pleading and endorsed on such copy of citation the date of delivery.

Service Fee: $ _____

Sworn to and subscribed before me this the
_____ day of _____, _____.

_____
Notary Public, THE STATE OF TEXAS
**D-1-GN-25-003866**

_____
Sheriff / Constable / Authorized Person

By: _____

_____
Printed Name of Server

_____ County, Texas

**SERVICE FEE NOT PAID**

5/29/2025 5:52 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-003866
Ana Henriquez Quesada

CAUSE NO. _____ D-1-GN-25-003866

| | | |
|---|---|---|
| RUSCO OPERATING, LLC, RUDTUK OPERATING, LLC, and WORKRISE TECHNOLOGIES INC., | § § § | IN THE DISTRICT COURT OF |
| *Plaintiffs,* | § § | 345TH, DISTRICT COURT |
| v. | § § | ____ JUDICIAL DISTRICT |
| SCOTTSDALE INSURANCE COMPANY, | § § | TRAVIS COUNTY, TEXAS |
| *Defendant.* | § | |

## PLAINTIFFS' ORIGINAL PETITION

Plaintiffs RUSCO Operating, LLC ("RUSCO"), RUDTUK Operating, LLC, and Workrise Technologies Inc. ("Workrise") (collectively "Plaintiffs"), file this Original Petition against Defendant Scottsdale Insurance Company ("Scottsdale").

This is an insurance breach of contract and bad faith case involving a dispute between the named insureds, Plaintiffs, and Scottsdale regarding two primary issues that have been raised in four underlying lawsuits involving Plaintiffs and/or their contractual indemnitees/Scottsdale's additional insureds:

(1) Whether the additional insured coverage afforded by the commercial general liability policies issued by Scottsdale (which contain nearly identical language for multiple policy periods) is limited under the policies' conditions section such that it does not cover injuries arising out of the additional insured's own liability or whether the broader "Additional Insured—Owners, Lessees or Contractors" endorsement applies to cover for liability "arising out of" the named insured's ongoing operations performed for the additional insured; and

(2) Whether the commercial general liability policies issued by Scottsdale provide the right for Scottsdale to seek reimbursement for defense costs under the policies' condition section for "Claim and Loss Apportionment" or whether that provision is limited to the claims-made Contractor's Pollution Liability (or "CPL") coverage part and not the CGL coverage part.

Plaintiffs seek a declaratory judgment that (1) the policies' broader "Additional Insured— Owners, Lessees or Contractors" endorsement applies to cover for liability "arising out of" the

**PLAINTIFFS' ORIGINAL PETITION**                                                                 **Page 1**

named insured's ongoing operations performed for the additional insured for the various claims and additional insureds involved in those claims; and (2) Scottsdale is precluded from seeking reimbursement of defense costs it has paid and continues to pay in defending the additional insureds in the various lawsuits because it is defending those additional insureds under the CGL coverage part, and the policies' waiver of subrogation precludes Scottsdale's right to seek reimbursement.

## I.    DISCOVERY CONTROL PLAN

1.    Discovery in this matter is intended to be conducted under Level 2, pursuant to Rule 190.3 of the Texas Rules of Civil Procedure.

2.    Pursuant to Texas Rule of Civil Procedure 47(c), the Plaintiffs seek monetary relief over $1,000,000.

## II.    JURISDICTION & VENUE

3.    The Court has jurisdiction over this matter because the amount in controversy, exclusive of interest and costs, exceeds the Court's minimum jurisdictional limits.

4.    RUSCO Operating LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Austin, Texas.

5.    RUDTUK Operating, LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Austin, Texas.

6.    Workrise Technologies, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business in Austin, Texas.

7.    Upon information and belief, Scottsdale is an insurance company that does business in Texas, is incorporated in Ohio, and has its principal place of business in Scottsdale, Arizona. Scottsdale's registered agents for service of process are the Commissioner of Insurance,

P.O. Box 149104, Austin, Texas 78714 and Corporation Service Company, d/b/a CSC-Lawyers Incorporating Service Company, 211 East 7th Street, Suite 620, Austin, TX 78701.

8.      Venue is proper in Travis County, Texas pursuant to Section 15.002 of the Texas Civil Practice and Remedies Code because all or a substantial part of the events or omissions giving rise to this claim occurred in Travis County, Texas.  More specifically, Scottsdale issued insurance policies to the Plaintiffs in Travis County, and these policies were delivered to the Plaintiffs at their offices in Travis County. Scottsdale's communications with the Plaintiffs concerning the issues involved in this petition were sent to the Plaintiffs in Travis County. Additionally, because the Plaintiffs' headquarters are in Travis County, the Plaintiffs will be damaged by Scottsdale's breach in Travis County.

### III.      FACTUAL BACKGROUND

9.      Plaintiffs incorporate the foregoing allegations herein by reference.

10.      RUSCO is a referral services business whereby it connects companies looking for workers with workers looking for work. To facilitate its business, RUSCO contracts with companies via service agreements, in which it is required to indemnify the companies for certain liabilities and procure insurance that, among other things, names the companies as an additional insureds under RUSCO's policies.

11.      RUSCO has entered into multiple Master Service Agreements that are implicated in this action (collectively, the "MSAs"). The MSAs generally require RUSCO to indemnify the companies for specific types of liability and procure insurance that provides coverage to the companies as additional insureds.

12.     RUSCO and its parent, Workrise, procured insurance policies from Scottsdale for various policy periods to cover these companies as additional insureds pursuant to their insurance obligations.

13.     However, Scottsdale has failed to fulfill its contractual obligations to fully defend and, in some instances, indemnify these additional insureds for lawsuits that were brought by Plaintiffs' workers against the companies/additional insureds, including for the following claims: (A) the *Bauer* Claim; (B) the *Plybon* Claim; (C) the *Rolens* Claim; and (D) the *Stroebel* Claim.

14.     For each of these claims, Scottsdale maintains that it is entitled to reimbursement for defense costs and settlement payments from its additional insureds, which is not permitted under the policies.

## A.     The *Bauer* Claim

### i.     RUSCO's MSA With Statoil

15.     On May 22, 2017, Statoil Oil & Gas LP[1] and RUSCO executed the Onshore[2] Master Service Agreement for Goods and/or Services (the "Statoil MSA").

16.     Under the Statoil MSA, RUSCO was required to provide certain oilfield services—including, but not limited to, inspecting Equinor/Grayson Mill Williston, LLC's ("Grayson Mill") tank batteries.

17.     The Statoil MSA obligates RUSCO to defend and indemnify Equinor and Grayson Mill.[3]

---

[1] Statoil Oil & Gas LP is the predecessor in interest to Equinor Energy LP ("Equinor").
[2] Onshore Quality Control Specialists, LLC ("Onshore") is a wholly owned subsidiary of Workrise.
[3] "Contractor's Indemnification of Company: Contractor shall release Company Group of any liability for, and shall protect, defend and indemnify Company Group from and against all Claims of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any Party or Parties, arising in connection herewith, including during any ingress, egress, loading or unloading of personnel or cargo, arising out of any illness, bodily injury, death or loss or damage to property of any member of Contractor Group, Regardless of Fault."

18.    The Statoil MSA also requires RUSCO to obtain insurance to support its defense and indemnity obligations, including by providing additional insured coverage to members of Company Group, which includes Equinor and Grayson Mill.

     **ii.    RUSCO procured Scottsdale Policy No. VRS0004992 to satisfy its obligations to procure additional insured coverage for Grayson Mill and Equinor, as well as its contractual indemnity obligations.**

19.    Scottsdale issued Policy No. VRS0004992 to Workrise. RUSCO is a Named Insured under the Policy's Schedule of Named Insureds endorsement. The Policy provides commercial general liability coverage for the period February 1, 2021 to February 1, 2022.

20.    Under the Insuring Agreement for Coverage A – Bodily Injury and Property Damage Liability, Scottsdale "will pay those sums that the Insured becomes legally obligated to pay as damages" because of "bodily injury" that occurs during the Policy Period and is caused by an "Occurrence."

21.    The definition of "Insured" includes "Any person or entity specifically endorsed onto this Policy as an Additional Insured" and "Any person or organization the Named Insured is required to name as an additional insured in a written contract or agreement[.]"

22.    The common policy conditions amend the definition of "insured" to include "additional insureds," defined as:

> Any person or organization the NAMED INSURED is required to name as an additional insured in a written contract or agreement, but only with respect to "your work," YOUR SERVICES or PROFESSIONAL SERVICES performed by or on behalf of the NAMED INSURED for that person or organization. However, such persons or organizations are covered only with respect to "bodily injury," "property damage," "personal and advertising injury," or LOSS arising out of "your work," YOUR SERVICES or PROFESSIONAL SERVICES and are not covered for any "bodily injury," "property damage," "personal and advertising injury," or LOSS arising out of the person's or organization's own liability.

23.    Importantly, however, to comply with RUSCO's obligations under the Statoil MSA, the Policy contains an "Additional Insured – Owners, Lessees or Contractors – Scheduled Person or Organization" Endorsement, which further amends the definition of "Insured" as follows:

> **Section II – Who Is An Insured** is amended to include as an insured [any person or organization that the insured has agreed and/or is required by contract to name as an additional insured], but only with respect to liability arising out of your ongoing operations performed for that insured.

24.    Plaintiffs contracted for and paid premiums for this blanket Additional Insured Endorsement in order to comply with their obligations under the Statoil MSA.

25.    This Additional Insured Endorsement is controlling and provides coverage to Grayson Mill and Equinor as additional insureds arising out of RUSCO's ongoing operations for Grayson Mill and Equinor.

26.    The CGL Coverage Part specifically covers RUSCO for sums it is legally obligated to pay as damages because of bodily injury to which the insurance applies. Although the CGL Coverage Part contains a "contractual liability" exclusion, the exclusion does not apply to liability for damages assumed under an "insured contract."

27.    "Insured Contract" is defined to include a contract under which RUSCO assumed the tort liability of another party to pay for bodily injury to a third person or organization.

28.    The MSA clearly fits the definition of an "Insured Contract."

**iii.    The *Bauer* Litigation**

29.    On June 3, 2021, Torie Bauer, a RUSCO 1099 contractor, sustained injuries due to a fall from a metal staircase while performing leak detection and repair at Equinor/Grayson Mills' tank batteries.

30.    Bauer alleges that while conducting the inspection, she saw a flash fire and turned to descend the stairs and fell, suffering personal injuries.

31.    Bauer sued Equinor and Grayson Mill in the lawsuit styled *Torie Bauer v. Equinor Energy LP and Grayson Mill Williston, LLC*, cause no. 21-cv-170, in the United States District Court for the District of North Dakota, Western Division.

32.    Equinor and Grayson Mill tendered the *Bauer* lawsuit to RUSCO for defense and indemnity under the Statoil MSA.

33.    RUSCO timely provided these tenders to Scottsdale under the policy, which provides both a commercial general liability coverage ("CGL") and contractor's pollution liability coverage ("CPL").

34.    Scottsdale agreed in a May 4, 2022 letter to defend Equinor and Grayson Mill as additional insureds under a reservation of rights, noting that Equinor and Grayson Mill qualified as insureds under the CGL section's blanket additional insured endorsement.

35.    For two years, Scottsdale assumed its duty to defend Equinor and Grayson Mill pursuant to the CGL Coverage Part.

36.    However, a mere day before the mediation in the *Bauer* lawsuit, Scottsdale filed a declaratory judgment action against Equinor and Grayson Mill seeking reimbursement of all defense costs and settlement amounts it paid on behalf of Equinor and Grayson Mill related to the *Bauer* lawsuit pursuant to the Claim and Loss Apportionment provision in the policy (*Scottsdale Insurance Company v. Equinor Energy LP and Grayson Mill Williston, LLC*, Case No. CV-24-438 in the United States District Court for the Western District of Texas).

37.    Based on information and belief, Scottsdale filed the declaratory action for leverage in the underlying settlement negotiations to encourage other parties to contribute to any settlement.

**PLAINTIFFS' ORIGINAL PETITION**                                                        **Page 7**

38.     The underlying *Bauer* lawsuit subsequently settled, at the direction and control of Scottsdale. However, in the coverage litigation filed by Scottsdale, Scottsdale improperly seeks reimbursement of all defense costs and indemnity it paid in the *Bauer* lawsuit to defend and indemnify Grayson Mill and Equinor.  Through their previous tenders to RUSCO, to the extent that Grayson Mill and Equinor are not covered as additional insureds, Grayson Mill and Equinor seek to hold RUSCO accountable for any amounts that Scottsdale refuses to pay (or has sought as reimbursement).

39.     The Claim and Loss Apportionment provision does not apply to the Bauer claim because it only applies to the CPL Coverage Part, not the CGL Coverage Part, and Scottsdale acknowledged in its initial reservation of rights that it was defending pursuant to the CGL Coverage Part.

40.     Even if Scottsdale now claims it provided defense costs and paid the settlement pursuant to the CPL Coverage Part, it did not comply with the requirements for the Claim and Loss Apportionment provision to apply.

41.     The Claim and Loss Apportionment provision provides the following:

> If a Claim[4] made against an Insured includes both covered and uncovered allegations . . . the Insured and the Company recognize that there must be an allocation between covered and uncovered Claim Expenses[5] and Loss[6] payments, if any. The Insured and the Company ***shall use good faith efforts to agree upon a fair allocation*** between covered and uncovered Claims, Claim Expenses, and Loss taking into account the relative legal and financial exposures, and the relative

---

[4] "Claim" is a capitalized and defined term only in the CPL Coverage Part to mean "any written notice, demand or request for defense, request for indemnity, or other legal or equitable proceeding against any INSURED by a person, entity or asserted class for LOSS. It also means a civil proceeding, arbitration or any other alternative dispute resolution in which the damages alleged are because of LOSS, to which this insurance applies."

[5] "Claim Expenses" is defined only in the CPL Coverage Part to mean "all reasonable and necessary costs, charges and expenses resulting from the adjustment, appraisal, investigation, defense, arbitration, appeal or settlement of any covered CLAIM, if such costs, expenses and charges are incurred by the Company, an attorney designated by the Company, or by any INSURED with the written consent of the Company."

[6] "Loss" is capitalized and defined only in the CPL Coverage Part to mean "expenses, monetary awards or settlements of damages for which this insurance applies including . . . BODILY INJURY."

---

**PLAINTIFFS' ORIGINAL PETITION**                                                      **Page 8**

benefits obtained in connection with the defense and/or settlement of the Claim by the Insured or others.

a. If the Insured and the Insurer are unable to agree on the amount of the allocation, *then the Company shall pay only those amounts (excess of the Deductible) which the Company deems to be fair and equitable* until a different amount shall be agreed upon or determined pursuant to the terms of this Policy.

b. The Company may advance Claims Expenses and or Loss pursuant to this paragraph prior to the final disposition of any such Claim, provided such Claim is covered by this Policy. *Any such advance shall be on the condition that:*

(1) the appropriate Deductible has been satisfied; and
(2) any amounts advanced by the Company shall serve to reduce the Limit of Liability stated in the Declarations to the extent they are not in fact repaid; and
(3) *the Insured and the Company have agreed upon the portion of the Claims Expenses or Loss attributable to covered Claims against the Insureds*; provided, *however, if no agreement, the Company shall pay Costs of Defense as specified herein*; and
(4) in the event it is finally established that the Company has no liability under the Policy for such Claim, the Insured will repay the Company all Claims Expenses and/or Loss advanced by virtue of this provision.

42.      As an initial matter, this provision uses capitalized, defined terms like "Claim," "Claim Expenses" and "Loss" that are only referenced and defined in the CPL Coverage Part, not the CGL Coverage Part. In its May 4, 2022 reservation of rights letter, Scottsdale acknowledged that it was defending Equinor and Grayson Mill pursuant to the CGL Coverage Part, under which Scottsdale has the duty to defend any insured. Therefore, this Claim and Loss Apportionment provision does not apply to any defense costs or settlement payments made by Scottsdale.

43.      At a minimum, even if it is ambiguous whether this Claim and Loss Apportionment provision applies to the CGL Coverage Part, any such ambiguity must be construed in favor of the Plaintiffs.

44.      Moreover, to the extent Scottsdale claims it provided defense costs or settlement payments pursuant to the CPL Coverage Part in order to claw back these payments, the Claim and Loss Apportionment provision expressly requires that Scottsdale "*shall* use good faith efforts" to

agree upon a "fair allocation" of claim and loss payments and expenses with RUSCO. That never happened.

45.    Instead, Scottsdale agreed in its May 4, 2022 reservation of rights letter to bear 100% of the defense costs from the *Bauer* lawsuit, and for two years, Scottsdale controlled the defense and made no attempt to raise the "Claim and Loss Apportionment" provision, nor did it seek to determine a fair allocation of costs.

46.    Scottsdale has therefore waived any claim that it used any "good faith" efforts to determine how to allocate the losses, and its payment of defense costs and indemnity are based on covered claims.

47.    Moreover, since no agreement was reached with the insureds regarding allocation, any amounts that Scottsdale paid constitute amounts it deemed "fair and equitable" and were advanced for covered claims.

48.    Despite the Plaintiffs' efforts, however, Scottsdale continues to wrongly assert that it is entitled to reimbursement from the additional insureds.

49.    In addition to the scope of additional insured coverage and Claim and Loss Apportionment, Scottsdale relies on various exclusions that they claim precluded any coverage obligations, including (1) the pollution exclusion, (2) the expected or intended injury exclusion; (3) the CGL's "Testing or Consulting Errors and Omissions" Exclusion; and (4) The CPL's "Professional Liability" Exclusion D. None of these exclusions apply to preclude coverage. The Policy's CGL Coverage Part contains a pollution exclusion, which excludes:

> (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge dispersal, seepage, migration, release or escape of "pollutants":
>
> a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph

shall not apply to . . .

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire."

e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants."

50.    The Policy defines the term "Pollutants" to mean "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

51.    The Policy defines "hostile fire" as "one which becomes uncontrollable or breaks out from where it was intended to be."

52.    The pollution exclusion does not apply. First, Bauer's allegations do not support the conclusion that the release of hydrocarbons was the cause of Bauer's injuries. The Underlying Complaint alleges that Bauer "felt extreme heat" rising from the fiberglass storage tank, was "hit with flames on her face and frontside" and "tumbled down the metal stairs." *See* Bauer First Am. Compl. ¶¶ 27-28. Thus, Bauer alleges that her bodily injuries arose from flames and falling down the stairs, not the release of any pollutants. Scottsdale also ignores the hostile fire exception. Under the facts set forth in the Underlying Complaint, the heat and flames that allegedly broke out of the thief hatch caused Bauer's injuries. There are no allegations that the fire was controlled or intended to be in the area where Bauer's injuries occurred. Evidence and testimony developed in the

Underlying Lawsuit indicated that static electricity ignited vapors, causing a flash fire. Thus, the damage was not allegedly caused by the vapors, but rather the heat from an uncontrolled fire. Assuming, arguendo, that the alleged release of hydrocarbons would be treated as a "pollutant," the allegations and evidence support that the hostile fire exception applies.

53.    Moreover, if Scottsdale believes that the scope of Bauer's work was for testing or monitoring the effects of "pollutants," Bauer generally alleged she was "performing leak detection and repair at Equinor's Facility" and Bauer "detected leaks coming from several water and oil storage tank thief hatches." *See* Bauer First Am. Comp. at ¶¶ 12, 21-22.

54.    These allegations are incredibly broad and not sufficient to demonstrate that Bauer was performing any testing or monitoring specifically for "pollutants" or assessing the effects of "pollutants." Moreover, Bauer alleges that her injuries were caused by Equinor's failure to provide "adequate, safe, and suitable equipment and materials for operations at Equinor's Facility" and failure to "warn or instruct workers at Equinor's Facility about the hazards under the circumstances presented." Bauer First Am. Comp. at ¶¶ 36-37.16 Thus, pollution exclusion subsection (e) does not allow Scottsdale to avoid coverage either.

55.    Scottsdale also argues that Bauer's bodily injuries were "expected or intended from the standpoint of the insured" (the "E&I Exclusion") based on allegations that Equinor and/or Grayson Mills knew that the access hatches "were not properly grounded and could cause static electricity discharge and explosion." But there is simply no evidence or allegation to support a finding that Equinor or Grayson Mill actually expected or intended for Bauer to suffer injuries by the fire or by falling down the stairs. The E&I Exclusion does not apply.

56.    The Policy's CGL coverage does not extend to "bodily injury" arising out of "an error, omission, defect or deficiency" in any "test performed" or "evaluation, a consultant or advice

given" by or on behalf of any insured[.]" The Policy does not define any terms, including "test," "evaluation," "consultation," or "advice."

57.    Scottsdale cannot point to any specific error, omission, defect or deficiency in any test performed, or evaluation or consultation by or on behalf of Equinor or Grayson Mill. Moreover, to the extent Scottsdale believes that Bauer's visual inspections of a storage tank qualify as a "test performed," there are no allegations or evidence regarding how Bauer's bodily injuries arose out of any error, omission, defect or deficiency in Bauer's inspections.

58.    Furthermore, Scottsdale's attempt to seek reimbursement from its own insureds is also contrary to the Policy's "Waiver of Subrogation" clause, which specifies in relevant part:

> 22. The Company waives any right of recovery it may have against any person(s) or organization(s) to whom the NAMED INSURED agrees, in a written contract, to provide a waiver of subrogation because of payments the Company makes for injury or damage arising out of the YOUR SERVICES done under a contract with that person or organization.

59.    The MSA is a "written contract" and RUSCO agreed to provide a waiver of subrogation to Equinor and GMW regarding the services RUSCO agreed to perform under the MSA. Thus, Scottsdale specifically waived any right to recover against "any organization" (including Equinor and Grayson Mill) for amounts paid under the Policy, including defense costs and settlement amounts, that arose out of RUSCO's services performed under the MSA.

60.    Finally, to the extent that RUSCO is obligated to indemnify Equinor or Grayson Mill, RUSCO is entitled to coverage because the MSA is an insured contract and thus the Policy covers RUSCO's obligations as a contractual indemnitor to Equinor and Grayson Mill.

B.    The *Plybon* Claim.

   i.    **RUSCO's MSA with Talos**

   61.    On February 10, 2014, Talos Energy LLC, entered into a Master Service Agreement with Planning Through Completion LLC ("PTC") (the "Talos MSA"). Through a September 28, 2018 First Amendment to the MSA, Talos Production LLC[7] assumed the obligations of Talos Energy LLC, under that MSA, and RUSCO Operating LLC assumed the obligations of PTC.

   62.    Under the Talos MSA, "Company Group" means, in relevant part, Company [Talos] and its "contractors and subcontractors of every tier" and "Contractor" refers to RUSCO.

   63.    Under the Talos MSA, RUSCO agreed to release and defend, indemnify and hold harmless:

>    The Company Group from and against all Damages (without limitation and without regard to the cause or causes thereof, and whether or not arising in whole or in part out of strict or statutory liability, the unseaworthiness or unseaworthiness of any vessel or craft or the negligence (sole, concurrent, contingent or otherwise) or other fault of the Company Group or any other person or entity) arising out of or related to the injury, illness or death . . . of any or all of the Contractor Group . . . in any way directly or indirectly arising out of or in connection with any Work or the performance of this Agreement or any Bridging Agreement or any presence on any premises or mode of transportation in connection therewith. The obligations set forth in this Paragraph 7(d) shall cover without limitation any medical, compensation or other benefits paid by Company or any member of the Company Group in connection with employees of Contractor (or its subcontractors, if any) and shall apply even if the employee is determined to be the statutory or borrowed employee of the Company or any other member of the Company Group.

   64.    Section 8 requires RUSCO to obtain commercial general liability insurance with contractual liability coverage for the liabilities assumed in the Talos MSA and requires RUSCO to name the Company Group as additional insureds. Exhibit A to the Talos MSA requires that coverage to be primary to any policies carried by the Company Group

---

[7] The name of Talos Production LLC was subsequently changed to Talos Production Inc. ("Talos").

65.    Additionally, Talos and Triton Diving Services, LLC ("Triton") are parties to another Master Service Agreement (the "Talos/Triton MSA") wherein Triton is a service contractor and performs work for Talos pursuant to the agreement. Thus, for purposes of RUSCO's insurance and indemnity obligations, both Talos and Triton are part of the "Company Group."

### ii.    RUSCO procured Scottsdale Policy No. VRS0004992 to satisfy its obligations to procure additional insured coverage for Talos and Triton.

66.    Scottsdale issued Policy No. VRS0004992 to Workrise. RUSCO is a Named Insured under the Policy's Schedule of Named Insureds endorsement. The Policy provides commercial general liability coverage for the period February 1, 2021 to February 1, 2022. It has a $1,000,000 limit of liability per occurrence.

67.    Under the Insuring Agreement for Coverage A – Bodily Injury and Property Damage Liability, Scottsdale "will pay those sums that the Insured becomes legally obligated to pay as damages" because of "bodily injury" that occurs during the Policy Period and is caused by an "Occurrence."

68.    The definition of "Insured" includes "Any person or entity specifically endorsed onto this Policy as an Additional Insured" and "Any person or organization the Named Insured is required to name as an additional insured in a written contract or agreement[.]"

69.    The common policy conditions amend the definition of "insured" to include "additional insureds," defined as:

1. Any person or entity specifically endorsed onto this Policy as an ADDITIONAL INSURED. If any, such ADDITIONAL INSURED shall maintain only those rights pursuant to this Policy as are specified by endorsement; or

2. Any person or organization the NAMED INSURED is required to name as an additional insured in a written contract or agreement, but only with respect to "your work," YOUR SERVICES or PROFESSIONAL SERVICES performed by or on behalf of the NAMED INSURED for

that person or organization. However, such persons or organizations are covered only with respect to "bodily injury," "property damage," "personal and advertising injury," or LOSS arising out of "your work," YOUR SERVICES or PROFESSIONAL SERVICES and are not covered for any "bodily injury," "property damage," "personal and advertising injury," or LOSS arising out of the person's or organization's own liability.

70.    Importantly, however, to comply with RUSCO's obligations under the MSAs, the Policy contains an "Additional Insured – Owners, Lessees or Contractors – Scheduled Person or Organization" Endorsement, which further amends the definition of "Insured" as follows:

**Section II – Who Is An Insured** is amended to include as an insured [any person or organization that the insured has agreed and/or is required by contract to name as an additional insured], but only with respect to liability arising out of your ongoing operations performed for that insured.

71.    Thus, Plaintiffs contracted for and paid premiums for this blanket Additional Insured Endorsement in order to comply with their obligations under the MSAs.

72.    This Additional Insured Endorsement is controlling and provides coverage to additional insureds arising out of their ongoing operations.

### iii.    *Plybon* Litigation

73.    Evan Plybon was contacted by Talos and hired by Triton as a crewmember aboard the Triton Hedron, a vessel in navigation upon navigable waters. Plybon was allegedly aboard the Hedron during Hurricane Ida when the Hedron drifted 6 miles into the Gulf of Mexico, nearly capsizing, and caused Plybon to suffer physical, mental, and emotional damages.

74.    Plybon sued Talos and Triton in the action styled *Plybon v. Triton Diving Servs. LLC, et al.*, No. 4:21-cv-03876 in Harris County, Texas under the Jones Act and general maritime law.

75.    Triton tendered the *Plybon* lawsuit to RUSCO for defense and indemnity under the Talos/Triton MSA, and Talos demanded that RUSCO and its insurers agree to indemnify Talos

and Triton for the *Plybon* lawsuit pursuant to the MSA and as additional insureds under RUSCO's insurance policy.

76.    RUSCO promptly provided these tenders to Scottsdale under the applicable policy.

**iv.    Scottsdale Improperly Reserved Rights To Seek Reimbursement Of Defense Costs And Deny Indemnity.**

77.    On February 3, 2022, Scottsdale accepted the defense of Triton and Talos as additional insureds under the Policy, subject to a reservation of rights. Scottsdale reaffirmed that Triton and Talos continue to "enjoy coverage" as additional insureds under the Policy on September 7, 2022.

78.    In an April 24, 2023 letter Scottsdale again reaffirmed that Triton and Talos "enjoy coverage" as additional insureds for claims arising out of "any general maritime law or other similar claims pursued by Plybon against Talos and Triton."

79.    Scottsdale agreed under a reservation of rights to provide a defense to Talos and Triton but maintains that it would seek contribution for defense costs and any settlement payments, asserting that the applicable policy does not provide coverage to additional insureds for losses arising out of their own liability.

80.    Under the Insuring Agreement for Coverage A – Bodily Injury and Property Damage Liability, Scottsdale "will pay those sums that the Insured becomes legally obligated to pay as damages" because of "bodily injury" "to which the insurance applies."

81.    The common policy conditions amend the definition of "insured" to include "additional insureds," defined as:

> Any person or organization the NAMED INSURED is required to name as an additional insured in a written contract or agreement, but only with respect to "your work," YOUR SERVICES or PROFESSIONAL SERVICES performed by or on behalf of the NAMED INSURED for that person or organization. However, such persons or organizations are covered only with respect to "bodily injury," "property

damage," "personal and advertising injury," or LOSS arising out of "your work," YOUR SERVICES or PROFESSIONAL SERVICES and are not covered for any "bodily injury," "property damage," "personal and advertising injury," or LOSS arising out of the person's or organization's own liability.

82.    Importantly, however, to comply with RUSCO's obligations under the MSAs, the

Plaintiffs paid premiums to obtain the Policy's "Additional Insured – Owners, Lessees or

Contractors – Scheduled Person or Organization Endorsement," which further amends the

definition of "Insured" as follows:

> **Section II – Who Is An Insured** is amended to include as an insured [any person or organization that the insured has agreed and/or is required by contract to name as an additional insured], but only with respect to liability arising out of your ongoing operations performed for that insured.

83.    This Additional Insured Endorsement is controlling and provides coverage to

additional insureds arising out of their ongoing operations.

84.    At a minimum, the Conditions and the Additional Insured Endorsement are, at the

very least, ambiguous because the Endorsement broadly grants coverage for liability "arising out

of" RUSCO's ongoing operations for Talos.

85.    RUSCO has advised Scottsdale that the policy's blanket additional insured

endorsement provides coverage for this claim, but Scottsdale continues to maintain that it will

pursue reimbursement for any defense costs it has incurred in defending RUSCO, Talos, or Triton.

86.    Moreover, Scottsdale has relied on an exclusion called the U.S. Longshoremen's &

Harbor Workers' Compensation Act Including Jones Act and Other Admiralty or Maritime

Employer's Acts Liability Exclusions Endorsement, which provides the following:

It is agreed that this insurance does not apply:

(a) to any liability arising out of:
    (1) the United States Longshoremen's & Harbor Workers' Compensation Act (U.S. Code [1946] Title 33, Sections 901-49), or
    (2) the Jones Act, or

(3) any other admiralty jurisdiction or maritime employers' liability act, including any amendments thereto.

(b) to "bodily injury" to:
    (1) an employee of the insured arising out of and in the course of employment
by the insured in any maritime duty, including but not limited to:
        (i) a longshoreman and/or harbor worker, or
        (ii) a master or member of the crew of any vessel, or
    (2) the spouse, child, parent, brother or sister of that employee as a consequence of (1) above.

This exclusion applies:

(1) whether the insured may be liable as an employer or in any other capacity; and

(2) to any obligation to share damages with or repay someone else who must pay damages because of injury.

87.    The policy also contains a Severability Clause that states that "this insurance applies . . . separately to each INSURED against whom a CLAIM is made." Therefore, this exclusion must be read to apply separately to each insured seeking coverage under the policy (RUSCO, Talos, and Triton).

88.    Here, Plybon does not seek to hold Triton responsible as an employer or allege that his injuries arose out of and in the course of employment by Triton in any maritime duty. Talos is also not an employer of Plybon for purposes of this exclusion.

89.    Moreover, Plybon's claims were not limited to the Jones Act, but included claims of general maritime negligence.

90.    Because this Maritime Employer's Liability Act Exclusion does not unambiguously preclude coverage for Plybon's claims, both Talos and Triton are entitled to coverage as additional insureds.

91.    Similarly, the Policy does not entitle Scottsdale to seek reimbursement of defense costs because (1) the Policy's Claim and Loss Apportionment does not apply to the CGL coverage

section under which Scottsdale is defending; and (2) Scottsdale specifically waived the right to seek subrogation against the additional insureds for these costs.

92.    Scottsdale has refused to fully defend and indemnify RUSCO, Talos, and Triton for the claims made by Plybon, and RUSCO has suffered injuries as a result.

## C.    The *Rolens* Claim

### i.    The Tug Hill MSA

93.    On September 24, 2018, RUSCO entered into an MSA with Tug Hill Operating, LLC ("the Tug Hill MSA").  Tug Hill later assigned its interest to EQT Production Company ("EQT").

94.    The Tug Hill MSA requires RUSCO to defend, indemnify, and hold harmless Tug Hill and EQT[8] from and against all damages arising out of all injuries, losses, and property damage in any way directly or indirectly arising out of or in connection with the work performed under the MSA.

95.    The Tug Hill MSA also requires RUSCO to procure insurance which names Tug Hill and EQT as additional insureds.

### ii.    RUSCO Procured Scottsdale Policy No. VRS0005695 To Satisfy Its Obligations Under The Tug Hill MSA To Include Tug Hill and EQT As Additional Insureds.

96.    Scottsdale issued Policy No. VRS0005695 to Workrise and RUSCO. The Policy provides commercial general liability coverage for the period February 1, 2022 to February 1, 2023.

---

[8] THO/EQT collectively refers to the "Company Group," which includes THO/EQT, and its "parents, affiliates, subsidiaries, partners, joint owners and joint venturers, and the directors, agents, representatives, employees, insurers, invitees, consultants of all of the foregoing."

97.    Under the Insuring Agreement for Coverage A – Bodily Injury and Property Damage Liability, Scottsdale "will pay those sums that the Insured becomes legally obligated to pay as damages" because of "bodily injury" "to which the insurance applies."

98.    The common policy conditions amend the definition of "insured" to include "additional insureds," defined as:

> Any person or organization the NAMED INSURED is required to name as an additional insured in a written contract or agreement, but only with respect to "your work," YOUR SERVICES or PROFESSIONAL SERVICES performed by or on behalf of the NAMED INSURED for that person or organization. However, such persons or organizations are covered only with respect to "bodily injury," "property damage," "personal and advertising injury," or LOSS arising out of "your work," YOUR SERVICES or PROFESSIONAL SERVICES and are not covered for any "bodily injury," "property damage," "personal and advertising injury," or LOSS arising out of the person's or organization's own liability.

99.    Importantly, however, to comply with RUSCO's obligations under the MSAs, the Plaintiffs paid premiums to obtain the Policy's "Additional Insured – Owners, Lessees or Contractors – Scheduled Person or Organization Endorsement," which further amends the definition of "Insured" as follows:

> **Section II – Who Is An Insured** is amended to include as an insured [any person or organization that the insured has agreed and/or is required by contract to name as an additional insured], but only with respect to liability arising out of your ongoing operations performed for that insured.

100.    This Additional Insured Endorsement is controlling and provides coverage to additional insureds arising out of RUSCO's ongoing operations.

**iii.    The Rolens Lawsuit**

101.    Ronald Rolens, a RUSCO 1099 contractor assigned to work for Tug Hill on a Tug Hill well pad, commenced a lawsuit against Tug Hill, EQT Corporation (EQT's parent company), and Enerstar Rentals and Services Ltd. ("Enerstar") on about January 24, 2024 in the circuit court of Marshall County, West Virginia.

102.    Rolens alleged that on February 10, 2022, he fell out of his work trailer (which was rented from Enerstar) as a result of his attempt to escape heat and fumes in the trailer and suffered injuries.

103.    On May 28, 2024, EQT sent RUSCO an indemnity and defense tender letter for the *Rolens* lawsuit pursuant to the Tug Hill MSA and as additional insureds under RUSCO's insurance policy.

104.    Scottsdale agreed under a reservation of rights to provide a defense to EQT and Tug Hill.    Within this reservation of rights, Scottsdale contended that the common policy conditions limit Scottsdale's coverage for the additional insureds only for loss caused by RUSCO's acts or omissions and not for Tug Hill or EQT's own liability.

105.    However, the Additional Insured Endorsement is controlling and provides coverage to additional insureds arising out of their ongoing operations. Thus, coverage is not limited to the extent of a funding of RUSCO's own liability.

106.    At a minimum, the Conditions and the Additional Insured Endorsement are, at the very least, ambiguous because the Endorsement broadly grants coverage for liability "arising out of" RUSCO's ongoing operations for Tug Hill and/or EQT.

107.    Similarly, the Policy does not entitle Scottsdale to seek reimbursement of defense costs because (1) the Policy's Claim and Loss Apportionment does not apply to the CGL coverage section under which Scottsdale is defending; and (2) Scottsdale specifically waived the right to seek subrogation against the additional insureds for these costs.

**D.    The *Stroebel* Claim**

    **i.    RUDTUK's Agreement With Breitburn.**

108.    On March 25, 2020, Breitburn Operating LP and RUDTUK Operating, LLC entered into a Master Work Agreement (the "Breitburn MWA") whereby RUDTUK would provide and perform services for Breitburn.

109.    Under the MWA, RUDTUK agreed to release, defend, indemnify, and hold harmless the Breitburn Group[9] for all loss, cost, damage, or expense directly or indirectly arising out of bodily injury to members of contractor group and property damage in any manner connected with the work contemplated by the MWA.

110.    Additionally, the MWA also requires RUDTUK to procure and maintain insurance that extends to and provides additional insured coverage for the Breitburn Group.

**ii.    RUDTUK Procured Scottsdale Policy No. VRS0006434 To Satisfy Its Additional Insured Obligations To Breitburn Group.**

111.    Scottsdale also issued Policy No. VRS0006434 to Workrise Technologies, Inc. (the "Policy"). RUDTUK Operating, LLC is a Named Insured under the Policy.  The Policy provides commercial general liability coverage for the February 1, 2023 to February 1, 2024 policy period.

112.    Under the Insuring Agreement for Coverage A – Bodily Injury and Property Damage Liability, Scottsdale "will pay those sums that the Insured becomes legally obligated to pay as damages" because of "bodily injury" "to which the insurance applies."

113.    The common policy conditions amend the definition of "insured" to include "additional insureds," defined as:

> Any person or organization the NAMED INSURED is required to name as an additional insured in a written contract or agreement, but only with respect to "your work," YOUR SERVICES or PROFESSIONAL SERVICES performed by or on behalf of the NAMED INSURED for that person or organization. However, such persons or organizations are covered only with respect to "bodily injury," "property

---

[9] "Breitburn Group" means Breitburn, its Affiliates, co-owners and co-lessees at the Site, joint venturers, partners, members, and managers, its other contractors and subcontractors of every tier (and their Affiliates) and the respective directors, officers, employees, representatives, and agents of all of the foregoing, but excluding any member of the Contractor Group.

**PLAINTIFFS' ORIGINAL PETITION**                                                        **Page 23**

damage," "personal and advertising injury," or LOSS arising out of "your work," YOUR SERVICES or PROFESSIONAL SERVICES and are not covered for any "bodily injury," "property damage," "personal and advertising injury," or LOSS arising out of the person's or organization's own liability.

114.    Importantly, however, to comply with RUSCO's obligations under the MSAs, the Plaintiffs paid premiums to obtain the Policy's "Additional Insured – Owners, Lessees or Contractors – Scheduled Person or Organization Endorsement," which further amends the definition of "Insured" as follows:

> **Section II – Who Is An Insured** is amended to include as an insured [any person or organization that the insured has agreed and/or is required by contract to name as an additional insured], but only with respect to liability arising out of your ongoing operations performed for that insured.

115.    This Additional Insured Endorsement is controlling and provides coverage to additional insureds arising out of their ongoing operations.

### iii.    The Stroebel Lawsuit

116.    On February 21, 2021, Brandon Stroebel was allegedly working for RUDTUK and called to troubleshoot a blocked compressor line by performing a blowdown or hydrate removal. He alleges that Maverick Natural Resources, LLC ("Maverick") provided training to RUDTUK employees on executing such procedure. While he was working to vent the line, a pipe dislodged due to a pressure release and hit Mr. Stroebel in the head, resulting in his fatality.

117.    Stroebel's family filed a lawsuit against Maverick and RUDTUK.

118.    Maverick tendered the lawsuit to RUDTUK pursuant to the Breitburn MWA.

119.    For ten months, Scottsdale defended Maverick as an additional insured under Policy No. VRS0006434 under a reservation of rights.  Then, two days before mediation was scheduled, Scottsdale advised for the first time in an email that it believes Maverick may not be an additional insured if RUDTUK has no liability.

120.    Despite the Plaintiffs' efforts to explain to Scottsdale that the policy's controlling additional insureds endorsement provides coverage for additional insureds and does not require that RUDTUK must be found liable to trigger Maverick's additional insured coverage, Scottdale continues to advance this position. In doing so, Scottdale risks putting its insureds, the Plaintiffs, in breach of their obligations under the MSAs to provide additional coverage to Maverick.

121.    For each of the Claims referenced above, Scottsdale has breached (or anticipatorily breached) the Policies by claiming a right to seek reimbursement of defense costs it has paid towards defending the additional insureds, which is not permitted under the Policies.

122.    Indeed, a live controversy exists because Scottsdale has already sought reimbursement from its additional insureds, Grayson Mill and Equinor, for the Bauer litigation despite the controlling blanket additional insured endorsement providing coverage and the waiver of subrogation provision.

123.    Plaintiffs seek declaratory relief that Scottsdale is precluded from seeking reimbursement under the Policies for the defense costs it has incurred and will continue to incur in defending the above-referenced additional insureds for their respective claims.

124.    Scottsdale claims that it is entitled to contribution from the Additional Insureds for defense costs and indemnity payments that Scottsdale previous paid to defend and/or settle claims

on behalf of Additional Insureds, including in the Bauer litigation, because the Policies only provide coverage to the Additional Insureds for liability arising out of RUSCO's liability.

125.    In doing so, Scottsdale relies on this clause from the common policy conditions: "However, such persons or organizations . . . are not covered for any . . . LOSS arising out of the person's or organization's own liability."

126.    Importantly, however, the Plaintiffs contracted for and paid premiums for the Policies' blanket Additional Insured Endorsement in order to comply with their obligations under the MSAs.  This endorsement amends the definition of insured to include as an insured anyone that the Plaintiffs are required to name as an additional insured and provides coverage to the additional insureds for liability arising out of their ongoing operations.

127.    This Additional Insured Endorsement is controlling and renders the conflicting clause in the common policy conditions section void.  At a minimum, the Additional Insured Endorsement and the Conditions are ambiguous and any ambiguity should be construed in favor of Plaintiffs.

128.    Despite Plaintiffs' efforts to explain to Scottsdale that the Additional Insured Endorsement is controlling and provides full coverage to the Additional Insureds for the various underlying lawsuits, Scottsdale continues to wrongfully assert that it is entitled to reimbursement of defense costs and any settlement payments from the Additional Insureds, necessitating this lawsuit.

129.    Similarly, the Policy does not entitle Scottsdale to seek reimbursement of defense costs because (1) the Policy's Claim and Loss Apportionment does not apply to the CGL coverage

section under which Scottsdale is defending; and (2) Scottsdale specifically waived the right to seek subrogation against the additional insureds for these costs.

## IV.    CAUSES OF ACTION

**A.    Breach of Contract Under Policy No. VRS0004992 (Bauer Claim)**

97.    The foregoing allegations are incorporated herein by reference.

98.    The Policies are valid and enforceable contracts.

99.    RUSCO and Workrise are named insureds under Policy No. VRS0004992 (the "Policy").

100.    Plaintiffs were contractually obligated to name Grayson Mill and Equinor as additional insureds under the Policy.

101.    Scottsdale is obligated to provide coverage to Grayson Mill and Equinor as Additional Insureds for liability arising out of the named insured's ongoing operations performed for Grayson Mill and Equinor for the Bauer Claim.

102.    Scottsdale has breached the Policy with the Plaintiffs by denying their coverage obligations to Grayson Mill and Equinor under the Policy for the liability described above and seeking reimbursement of defense costs and settlement payments from the Additional Insureds.

103.    As a result of Scottsdale's breach, Plaintiffs have suffered damages.

**B.    Declaratory Judgment**

104.    The foregoing allegations are incorporated herein by reference.

105.    The MSAs require RUSCO to provide the companies, including Maverick, Tug Hill, EQT, Talos, and Triton, for specific types of liability and procure insurance that provides coverage to these companies as additional insureds.

106.    RUSCO, along with its parent, Workrise, complied with these requirements by procuring insurance policies from Scottsdale for various policy periods to cover the companies

as additional insureds pursuant to their insurance obligations, including Policy Nos. VRS0004992, VRS0005695, and VRS0006434 (the "Policies").

107.    The Policies obligate Scottsdale to provide coverage for its Additional Insureds, including Maverick, Tug Hill, EQT, Talos, and Triton, by and through the "Additional Insured – Owners, Lessees or Contractors – Scheduled Person or Organization" Endorsement, which amends the definition of "Insured" as follows:

> **Section II – Who Is An Insured** is amended to include as an insured [any person or organization that the insured has agreed and/or is required by contract to name as an additional insured], but only with respect to liability arising out of your ongoing operations performed for that insured.

108.    This blanket endorsement, for which the Plaintiffs contracted and paid premiums for, is controlling over the Policies' common policy conditions. Therefore, Scottsdale must fully defend and indemnify these additional insureds for the lawsuits that were brought by Plaintiffs' workers against the companies/additional insureds, including (A) the *Bauer* Claim; (B) the *Plybon* Claim; (C) the *Rolens* Claim; and (D) the *Stroebel* Claim.

109.    However, Scottsdale maintains that it is entitled to reimbursement for defense costs and settlement payments from its additional insureds citing to the Policies' common policy conditions.

110.    Plaintiffs therefore ask the Court to declare that (1) the Policies' Additional Insured Endorsement is controlling over the common policy conditions, and accordingly, the Policies provide coverage to all additional insureds that the Plaintiffs are required to name as additional insureds for liability arising out of the named insured's operations performed for those additional insureds, (2) Scottsdale is precluded from seeking reimbursement of defense costs and/or indemnity from the Additional Insureds under its Policies because such rights of reimbursement

do not apply to the Policies' CGL coverage part and are precluded under the waiver of subrogation provision.

111.    There is a bona fide, actual, present, and practical need for these declarations to determine the rights and obligations of the parties under the Policies.

112.    There is a present controversy between Plaintiffs and Scottsdale concerning Scottsdale's duties and obligations under the Policies to Plaintiffs (as named insureds and contractual indemnitors) as well as the additional insureds who have been named in the Underlying Lawsuits.

113.    There is a present need for a declaratory judgment because Plaintiffs and Scottsdale have an actual, present, adverse, and antagonistic position regarding Scottsdale's duties and obligations under the Policies.

114.    The parties are entitled to have their respective rights and obligations finally declared and established.

## C.    Notice of Intent to Pursue a Claim under Chapter 541 of the Texas Insurance Code.

115.    The foregoing allegations are incorporated herein by reference.

116.    Pursuant to Section 541.154 of the Texas Insurance Code, Plaintiffs hereby provide notice of their intent to pursue a claim against Scottsdale under Section 541 of the Texas Insurance Code by amending this suit after 60 days.

117.    Scottsdale has engaged in unfair or deceptive acts or practices as defined by Section 541.061 of the Texas Insurance Code.

118.    Scottsdale has violated Chapter 541 of the Texas Insurance Code by, among other things (1) misrepresenting the terms of the Policies, (2) refusing to pay covered amounts regardless of whether other amounts may be reasonably in dispute, and (3) failing to promptly provide to the

Plaintiffs a reasonable explanation of the basis in the Policies, in relation to the facts or applicable law, for Scottsdale's failure to fully defend and indemnify the additional insureds.

119.    As a result of Scottsdale's violation of Chapter 541 of the Texas Insurance Code, the Plaintiffs will sustain substantial damages, including damages for breach of the MSAs and liability for any indemnity obligations under the MSAs that should have been covered under the Policies issued by Scottsdale.

120.    For these same reasons, it is also clear Scottsdale's violations were committed knowingly, warranting an award of up to three times the Plaintiffs' actual damages.

**D.    Breach of the Duty of Good Faith and Fair Dealing**

121.    The foregoing allegations are incorporated herein by reference.

122.    As the Plaintiffs' insurer, Scottsdale owes the Plaintiffs a duty of good faith and fair dealing in connection with the handling of claims under the Policies.

123.    Scottsdale has violated its duty of good faith and fair dealing by seeking contribution from its additional insureds and articulating demonstrably meritless coverage defenses, which, if accepted, would require a finding that its insureds, the Plaintiffs, breached their contractual obligations under the MSAs.

124.    Scottsdale's breach of their duty of good faith and fair dealing has caused the Plaintiffs to suffer considerable actual damages.

125.    Given the fact Scottsdale continues to advance defenses that would require a finding that its insureds breached their contractual obligations, Scottsdale's denial was clearly malicious, fraudulent, and/or grossly negligent.

126.    This justifies the imposition of punitive and exemplary damages, in addition to the Plaintiffs' compensatory damages.

**E.    Attorneys' Fees**

127.    The foregoing allegations are incorporated herein by reference.

128.    Due to the actions of Scottsdale, Plaintiffs have been required to retain the services of the law firm of Haynes and Boone, L.L.P. Plaintiffs have agreed to pay Haynes and Boone, L.L.P. a reasonable fee for its services necessarily rendered and to be rendered in this action. Pursuant to § 38.001 of the Texas Civil Practices & Remedies Code and Chapter 541 of the Texas Insurance Code, Plaintiffs are entitled to an award of reasonable attorneys' fees against Scottsdale in an amount to be established at trial.

**V.    JURY DEMAND**

129.    Plaintiffs hereby request a jury trial.

**PRAYER**

WHEREFORE, Plaintiffs respectfully request that this Court grant them the following relief:

A.    Judgment declaring that the Policies' Additional Insured Endorsement is controlling over the common policy conditions, and accordingly, the Policies provide coverage to all additional insureds that the Plaintiffs are required to name as additional insureds for liability arising out of their own operations;

B.    Judgment declaring that Scottsdale is precluded from seeking reimbursement of defense costs from the Additional Insureds under its Policies;

C.    Judgment awarding Plaintiffs all damages caused by Scottsdale's breach of contract for denying defense and indemnity for the Bauer Claim;

D.    Judgment awarding Plaintiffs all damages caused by Scottsdale's violations of Chapter 541 of the Texas Insurance Code, including treble damages for Scottsdale's knowing violations of such statute;

E.    Judgment awarding Plaintiffs damages, including punitive damages, for Scottsdale's breach of its duty to good faith and fair dealing;

F.    Judgment awarding Plaintiffs all reasonable and necessary attorneys' fees and expenses incurred in this matter under Chapter 38 of the Texas Civil Practice & Remedies Code as well as Chapter 541 of the Texas Insurance Code;

G.    Judgment awarding Plaintiffs all costs of court; and

H.    Such other and further relief to which Plaintiffs may be justly entitled.

Respectfully submitted,

*/s/ Emily Buchanan*
Emily L. Buchanan
Texas State Bar No. 24101568
Courtney A. Jones
Texas State Bar No. 24124067
HAYNES & BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, Texas 75201
emily.buchanan@haynesboone.com
courtney.jones@haynesboone.com
Telephone: (214) 651-5175
Telephone: (214) 651-5143

ATTORNEYS FOR PLAINTIFFS